2862. BROWN *v.* THE STATE.

1. The evidence authorized the conviction of voluntary manslaughter.
2. There was ample foundation laid for the introduction of the alleged dying declarations, to authorize the judge to submit them to the jury with proper instruction.
3. Where an objection goes to testimony as a whole, and part of the testimony is admissible, the objection may without error be overruled, though a part of the testimony be inadmissible.
4. Alleged dying declarations are admissible in evidence only when made at a time when the deceased was in the article of death. In the present

case the fact that the deceased was in the article of death when the alleged declarations were made was plainly and almost indisputably shown. In charging the jury upon the subject the judge at first correctly charged that to be receivable as a dying declaration, the statement must have been made by the deceased while in the article of death, but in a succeeding sentence, while again referring to the elements essential to such declarations being received in evidence, he omitted to call the attention of the jury to this element along with the others. Exception is taken to the portion of the charge in which the judge omitted reference to this element. *Held*, that prima facie the exception is well taken, but that when it is considered in connection with the state of the evidence on the subject, and in connection with what the judge also stated in the same context, the error is not deemed sufficiently harmful to justify a reversal; because it is probable that the jury was not misled by the inaccuracy of the statement.

5. While a person may be justifiable in killing to prevent his habitation from being entered through violence or surprise by persons attempting to enter in a riotous manner, even though they have no actual or apparent intention of committing a felony therein, but intend merely to commit a misdemeanor upon the slayer or some person dwelling in the habitation, yet the state of the evidence in this case was not such as to require the judge to submit to the jury any instruction on this subject.

6. The proposition, so often announced by this court and by the Supreme Court, that it is prima facie error for the court to instruct the jury that "provocation by words, threats, menaces and contemptuous gestures shall in no case be sufficient to free the person killing from the guilt and crime of murder," is still the law in this State. The quality of error in the statement quoted is its ineptitude to convey the idea intended to be conveyed, and its likelihood to mislead the jury in certain classes of cases. Under the facts of the present case and the charge of the court as a whole, there is no reasonable probability that the jury were misled or the defendant prejudiced by the giving of this instruction, in the context in which it was given.

DECIDED OCTOBER 14, 1910.

Indictment for murder; from Washington superior court— Judge Rawlings. June 28, 1910.

*A. R. Wright*, for plaintiff in error.

*Alfred Herrington*, solicitor-general, *James K. Hines, Evans & Evans, John R. Cooper*, contra.

POWELL, J. 1. The defendant was indicted for murder and convicted of voluntary manslaughter. The deceased was the marshal of a small town in Washington county. He had arrested a negro on some charge and was trying to get from the negro a gun which the latter had had during the afternoon. The negro told him that it was at his (the negro's) home. The deceased and a man named Wells and the negro went to a small house which seems to have

been occupied by the defendant's daughter. Wells held the negro
on the outside while the deceased opened a window and entered
the house.   Upon entering the house by breaking open the window,
the deceased found, in the room together, the defendant, who was
a white man, and also a woman, who was a daughter of the negro.
Just what happened inside the house about this time is not clearly
disclosed by the evidence.   It does appear that the deceased did
not find the gun, and the defendant says that the deceased hit him
and also the woman with his club.   It was in the night, and the de-
ceased had to desist from his search for the gun on account of a
lack of matches, there being no other form of light.   He asked the
defendant for a match and the latter replied that he did not have
one.   The woman came out of the house, as did the deceased, and
the defendant came as far as the door.   The deceased asked Wells to
get him some more matches, and Wells stepped to a store about 60
yards away and got the matches.   On his return he found the de-
fendant standing in the door with his gun in his hand, and the
deceased standing out in front of the house, some 6 to 10 steps
away, with his pistol in his hand, holding it down by his side.   It
seems that when the defendant started out of the house, he ac-
cidentally discovered that the negro had set the gun down beside
the steps.   He picked it up and had it in his hands when Wells
returned.   Wells handed the matches to the deceased, and the
latter struck one of them on the seat of his breeches, at the same
time moving a step or two toward the house.   Nowhere in the testi-
mony is there any evidence that he made any effort to point the
pistol toward the defendant, or to do him any violence, but the de-
fendant, in his statement to the jury, says that the deceased did
point the pistol toward him, saying "God damn you, I will kill
you," and, suiting the act to the word, was advancing rapidly with
the drawn pistol when the defendant shot him.   For the purpose
of making clear what is said in the further discussion of the case,
let it be noted here that the defendant made no contention that he
was deceived by an apparent situation of danger.   He stood
squarely on the proposition that he shot in actual self-defense—
that the deceased had drawn and pointed a pistol, and was ad-
vancing on him with the statement, "God damn you, I will kill
you;" and the defendant gave a reason for the deceased's so acting,
namely, that he had the moment before used opprobrious language

to the deceased, or at least language which the deceased might have considered opprobrious. It is true that the occurrence happened about 8 or 9 o'clock at night, but it was a bright, starlit night, and it seems that the persons of the parties and their movements could be plainly seen. There is no insistence to the contrary. The State's testimony was that when the deceased struck the match and started into the house, the defendant shot him, without any cause whatever; that while the officer had the pistol in his hand, holding it down by his side, he was not making, nor was he appearing to make any attack, nor was he using any language indicating that he was about to make an attack of any kind; apparently he was about to go back into the house to continue his search with the matches which Wells had just brought him. The theory of the State as to this feature of the case was that the defendant shot the deceased out of anger, because the latter had found him in the room with the negro woman, and had threatened to make a case against him for his illicit intercourse with her.

If it were not for the fact that the defendant in his statement set up that the deceased had struck him with his policeman's club but a few moments before, the verdict of voluntary manslaughter would hardly be supported by the evidence; it would probably be considered as one of those cases of murder or nothing, in which a compromise verdict would not be legally permissible. The jury, however, had the right to find that the defendant was aroused to anger by being beaten by the policeman with the club, both upon his head and upon his ribs, and that, while his passion was thus aroused and before it had subsided, he got into possession of the gun and did the killing; and in this phase of the case the verdict of voluntary manslaughter can be upheld.

2, 3. Objection is made to the admission of certain alleged dying declarations of the deceased, as follows: "I am shot for nothing; that man has shot me for nothing. I want you all to catch him and bring him up to the court. I want the court to deal with him. It isn't right for a man like that to be walking about here at large and for me to be shot all to pieces as I am; I can't stand it. That man has killed me for nothing." One of the objections is that the proper foundation was not laid for the admission of this alleged dying declaration. Without going into this objection in detail, it is sufficient to say that the foundation was amply laid

to make a prima facie case. The other objection was that the alleged declaration was not the statement of any fact relating to the cause of the death of the declarant or tending to identify the person who killed him, but was the mere expression of a conclusion of the declarant and of his personal feelings and desires as to the accused. If the objection had been directed to that portion of the statement which related to the desire of the deceased that the defendant be caught and dealt with, and to his views as to the defendant's being at large, there might have been merit in the objection; but the objection went to the testimony as a whole; and at least that portion of the declaration in which he said, "I am shot for nothing; that man has killed me for nothing," was certainly not subject to the objection stated. *White* v. *State,* 100 *Ga.* 659 (2), (28 S. E. 423) ; *Darby* v. *State,* 79 *Ga.* 63 (3 S. E. 663). And it is well settled that where an objection goes to the testimony as a whole, and a portion is admissible, the objection may without error be overruled by the court, although a portion would, as against specific objection made to it, be inadmissible.

4. The proposition stated in the fourth headnote seems to need no further elaboration.

5. Exception is taken to the fact that the court failed to instruct the jury concerning the contention of the defendant that he was acting in defense of his place of habitation against "two persons who manifestly intended and endeavored in a riotous and tumultuous manner to enter the same for the purpose of offering personal violence to the accused." It is insisted in connection herewith that the court erred in limiting the defendant's right of self-defense by charging that he would not have had the right to kill the deceased, unless the latter was attempting or apparently attempting to inflict a felony upon him. Counsel rely upon the decision in *McCray* v. *State,* 134 *Ga.* 417 (68 S. E. 62 (11)), in which it is held that a person may defend his place of habitation against two or more persons who manifestly intend in a riotous and tumultuous manner to enter the same for the purpose of assaulting or offering personal violence to some one dwelling therein, although the act intended, or apparently intended, would not amount to a felony. We see nothing in the record which would have rendered this charge applicable. In the first place, the defendant was not at his place of lawful habitation, but was apparently at his place

of unlawful cohabitation. There was no evidence that the deceased was, in connection with any other person, attempting to enter the house for the purpose of doing violence to any person dwelling therein. The woman who lived in the house had already left it. Certainly there was nothing in the State's testimony to bring the case within the provision of the law relied on; and it is a well-recognized proposition that if the defendant desires to have the judge instruct the jury upon principles of law applicable to some theory of the case set up only in his own unsworn statement, he must present a written request to charge upon the subject.

6. The judge in this case did what this court and the Supreme Court has often deprecated. He read to the jury in full section 65 of the Penal Code, including the language, "provocation by words, threats, menaces," etc. There are so many cases in which menaces, especially when accompanied by words and threats and other peculiar surroundings, will raise such an appearance of danger as to justify the defendant in killing, that the statement quoted from the section of the code is a very inapt form of expressing the law upon the subject. We think that the bench and the profession understand that this language, as used in connection with the section of the code on voluntary manslaughter, relates only to what will mitigate a killing from murder to manslaughter, and that it has no relation to the proposition that a person may justify a killing by showing that he acted in response to a reasonable fear that a felony was about to be committed upon him, although that fear may have been generated by words, threats, and menaces, taken in connection with the particular circumstances surrounding the killing. However, the ground of the prima facie error usually arising from the judge's giving this language in charge to the jury is not that the language is absolutely incorrect, as applied to the context in which it appears, but that it is so inaptly expressed as to be likely to mislead the jury, provided that the element of justification on account of reasonable fears aroused by an apparent situation of danger is present in the case. Therefore, as we held in the case of *Mixon* v. *State, 7 Ga. App.* 805 (9), (68 S. E. 315), "It is not unconditionally erroneous for a judge to instruct the jury that provocation by words, threats, menaces, and contemptuous gestures can in no case be sufficient to free the person killing from the guilt and crime of murder. Whether such a charge

is erroneous or not depends on the facts of the case, and on what else is said in the charge on the same subject." As we have endeavored to show in connection with the statement of facts at the opening of this opinion, the defendant did not rely upon a case of apparent self-defense, arising from misleading or unusual surroundings, but upon actual self-defense. If the defendant shot the deceased because the latter was in the act of advancing on him with a pointed pistol, ready to be used, coupled with the statement, "God damn you, I will kill you," he was justifiable; and no intelligent juror could have listened to the entire charge of the court without plainly so understanding. On the other hand, if the defendant shot the deceased because of anger aroused by the previous assault made upon him and while he was in a sudden heat of passion, the verdict of manslaughter was correct, irrespective of whether the deceased had used opprobrious words, and even threats, to the defendant; provided, of course, the deceased was not justified by an actual attack being made upon him at the time of the killing; and we think that the jury plainly understood the charge of the court to mean this. The jury might well have found the defendant guilty of murder, for there was enough in the evidence to make out a technical case of murder, but as the jury has acquitted the defendant of that offense, it will not be necessary for us to discuss the charge in relation to that feature of the case.

Taking the case as a whole, we find no such error as to require the grant of a new trial.                    *Judgment affirmed.*